IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-983

Filed 4 February 2026

Orange County, No. 14CVD001289-670

MATTHEW JASON ROYBAL, Plaintiff,

v.

CHRISTY ANNE RAULLI, Defendant.

Appeal by plaintiff from orders entered 29 March 2023, 25 April 2023, and 30 May 2023 by Judge Samantha H. Cabe in District Court, Orange County. Heard in the Court of Appeals 24 September 2024.

*Browner Law, PLLC, by Jeremy Todd Browner, for plaintiff-appellant.*

*Ellis Family Law, P.L.L.C., by Autumn D. Osbourne, for defendant-appellee.*

STROUD, Judge.

This opinion addresses four consolidated appeals by Plaintiff-Father of four orders entered by the trial court: (1) an order entered 29 March 2023 (Continuance Order) denying his "Motion and Order to Continue Motion to Continue" (Motion to Continue); (2) a "Memorandum of Order (Formal Order Pending)" (Memorandum of Order) entered 29 March 2023 granting Defendant-Mother's Motion to Modify Child Custody; (3) the subsequent Formal Modification of Child Custody Order (Formal Modification Order) entered 30 May 2023; and (4) an order entered 25 April 2023 titled "Amended Commitment Order for Civil Contempt," (Amended Commitment

Order) committing Father to jail for civil contempt. The issues on appeal for the first three orders arise from the trial court's denial of Father's Motion to Continue the hearing of Mother's Motion to Modify Custody because he was unavailable to attend the hearing due to military service. Father's Motion to Continue complied with the Servicemembers Civil Relief Act and he was entitled to a mandatory stay under the SCRA of the hearing on Mother's Motion to Modify Custody. The trial court erred by denying Father's Motion to Continue. Because the child custody modification hearing should have been continued or stayed and Father was prejudiced by the failure of the trial court to continue the hearing to a date he would be available or to stay for at least 90 days, the trial court further erred by entering the Memorandum of Order granting Mother's Motion to Modify Custody and the Formal Modification Order based on the hearing held on the day Father was not present due to his military service. We reverse the Continuance Order denying Father's Motion to Continue and vacate the Memorandum of Order and Formal Modification Order.

Father's remaining issue on appeal arises from the trial court's Amended Commitment Order of 25 April 2023. We must reverse this Amended Commitment Order because the trial court did not hold an evidentiary hearing or make any findings of fact as to Father's present ability to pay the amount previously set as a purge condition by the December 2022 Contempt Order.

## I. Factual and Procedural Background

This custody and child support case has had an exceptionally contentious and

complex history. This is Father's second appeal. In both the first appeal, *Roybal v. Raulli*, 266 N.C. App. 318, 832 S.E.2d 202 (2019) (*Roybal I*), and this one, most of the issues arose from scheduling complications related to Father's military service. Both cases also address Father's arguments that the trial court did not follow the requirements of laws enacted to protect parents serving our country in the armed forces from adverse consequences in pending litigation when they are unavailable due to their military service.[1]

In *Roybal I*, we addressed an issue of first impression under North Carolina's Uniform Deployed Parents Custody and Visitation Act, N.C. Gen. Stat. § 50A-371, arising from Father's deployment "in support of OPERATION ENDURING FREEDOM-HORN OF AFRICA" beginning in August 2018. 266 N.C. App. at 325-326, 832 S.E.2d at 207 (internal quotation marks omitted). In *Roybal I*, Father's deployment for military service was the reason for the parties' visitation dispute. *Id.* at 352, 832 S.E.2d at 222 ("We affirm the trial court's order as to Elizabeth, but we remand for the trial court to add Stepmother as a party to this action 'until the grant

---

[1] For example, in *Roybal I*, we noted that

> [d]espite Father's deployment date of 20 August 2018, the trial court set the hearing for 22 October 2018. Father filed a petition for a writ of mandamus with this Court to order the trial court to expedite the hearing as required under North Carolina General Statute Section 50A-371.5. On 24 September 2018, this Court granted Father's petition and ordered the trial court to hold a hearing by 8 October 2018. On 28 September 2018, the trial court held a hearing.

266 N.C. App. at 326, 832 S.E.2d at 207 (footnote omitted).

of limited contact is terminated' under North Carolina General Statute [Section] 50A-375(b) and to enter an order granting limited contact with Jay to Stepmother, *unless* the trial court determines that Jay does not have a 'close and substantial relationship' with Stepmother or that limited contact would be contrary to his best interests.").

This appeal presents an entirely different issue, but also an issue of first impression in North Carolina under a federal statute, the Servicemembers Civil Relief Act of 2003, 50 U.S.C.A. §§ 3901-4043 (SCRA).

Although originally enacted as the "Soldiers' and Sailor's Civil Relief Act of 1940," (SSCRA), Pub.L. 108-189, § 1, Dec. 19, 2003, 117 Stat. 2835, and later amended and codified as the SCRA in 2003, *id.*, no reported case in North Carolina has addressed the issue of when a servicemember is entitled to a stay or continuance under Section 50-3932 of the SCRA.[2]

Mother and Father (Parties) never married but have two children together: Elizabeth, born in 2012 while the Parties were still living together; and Jay, born in 2016 after the Parties' relationship had ended.[3] We addressed the background of their custody and child support case up to 2018 in detail in *Roybal I*. *See* 266 N.C.

---

[2] Only one unpublished case from this Court has addressed the SCRA, *Davidson v. Laws*, No. COA18-780, 269 N.C. App. 677, 837 S.E.2d 482 (2020) (unpublished). Neither party cited this case in their briefs and it has no precedential value, so we will not address it either. *See, e.g., Zurosky v. Shaffer*, 236 N.C. App. 219, 234, 763 S.E.2d 755, 764 (2014) ("[A]n unpublished opinion may be used as persuasive authority at the appellate level if the case is properly submitted and discussed and there is no published case on point." (citations omitted)).

[3] Pseudonyms are used to protect the identity of the minor children. *See* N.C. R. App. P. 42.

App. at 318-26, 832 S.E.2d at 202-07.  Relevant to this appeal, as of 2019, the Parties were operating under two custody orders: a consent order entered on 29 June 2016 regarding Elizabeth, and a consent order entered 11 July 2017 regarding Jay.  *Id.* at 324-25, 832 S.E.2d at 206-07.

On 1 July 2019, Mother filed a motion to modify child custody and a motion in the cause.[4]  The Parties reached an agreement to resolve this motion and the trial court entered a handwritten memorandum of order on 11 February 2020 which set the summer custody schedule for the two minor children and ordered Father to pay Mother $3,936.00 in "unreimbursed medical expenses."  Father was to pay $36.00 per month to Mother until the total amount of $3,936.00 was paid in full.  The Parties agreed to a consent order outlining these provisions in a formal order entered 28 May 2021.  "The [2021] [c]onsent [o]rder did not fully supersede [Elizabeth]'s and [Jay]'s Custody Orders."  So at that point, the parties had three separate orders governing child support, custody, and visitation.

On 11 August 2021, Mother filed a motion for contempt alleging Father "failed to abide by the terms" of the 2021 consent order, alleging that he was not making required child support payments, failed to pay arrearages, and did not reimburse Mother for medical and extracurricular expenditures for the children.  On 22 December 2022, the trial court entered a Contempt Order (Contempt Order) finding

---

[4] This motion is not in our record but it was identified in the memorandum of judgment/order entered on 11 February 2020.

Father in civil contempt. The Contempt Order set out a schedule for payment of the

total $28,059.13 arrearages owed as follows:

> b. [Father] shall pay [Mother] $28,059.13 owed as follows:
>
>> i. [Father] shall pay $4,600.00 to [Mother] by January 31, 2023, and provide proof of the same at calendar call in Orange County on said date at 9:00 a.m. (or as soon thereafter as the case is called at calendar call). Should [Father] fail to pay said amount and/or appear at calendar call with proof of the same, an [o]rder for his arrest shall be issued by this court at calendar call and [Father] shall surrender himself at said time and be incarcerated until such payment is made;
>>
>> ii. [Father] shall pay $4,600.00 to [Mother] by February 28, 2023, and provide proof of the same at calendar call in Orange County on said date at 9:00 a.m. (or as soon thereafter as the case is called at calendar call). Should [Father] fail to pay said amount and/or appear at calendar call with proof of the same, an [o]rder for his arrest shall be issued by this [c]ourt at calendar call and [Father] shall surrender himself at said time and be incarcerated until such payment is made[.]

The Contempt Order repeated the same provisions for Father to pay additional

payments of $4,600.00 due on 28 March 2023, 25 April 2023, and 23 May 2023. The

same provisions are repeated requiring Father to pay $5,059.13 by 27 June 2023.

Father was also required to reimburse Mother's attorney fees of $11,320.00 to be paid

in full directly to Mother no later than 5:00 p.m. on 30 June 2023.

On 31 January 2023, the first "calendar call" date set by the Contempt Order,

the Parties appeared before the trial court. At the start of the hearing, the trial court

noted that they were in court for a "check-in." Mother's counsel agreed, and stated, "it was my understanding that for the Raulli/Roybal matter, it was just a confirmation that . . . [Father] was paying what he was supposed to pay, and there wasn't actually a hearing to be heard. Am [I] misunderstanding?" The trial court responded "[n]o, I think you're right." The trial court received no evidence regarding Father's payment of child support or his ability to pay.[5] Counsel for both parties presented arguments regarding Father's compliance with various provisions of the Contempt Order, including some matters other than child support. Father had not paid the $4,600.00 due that day and he told the trial court he was in the process of selling a truck to make the payment. Father's counsel also informed the trial court that Father had

> received new military orders earlier this month, which include thirteen upcoming training events, plus one new set of long-term orders with three more pending for a September deployment. Effectively he'll be working for the military full time starting in March. His first training is supposed to take place this weekend, Friday through Sunday.

Upon rendering its ruling, the trial court noted there was no need for additional findings since "this was essentially a continuance of the commitment pursuant to that [C]ontempt [O]rder to give him additional time to come up with the money. So I'll . . .

---

[5] Both Parties testified very briefly regarding the names of some medical providers for the children, as there was some confusion about which providers Father needed to contact to arrange to be listed as guarantor for the children's medical bills.

have to do a commitment order and reference this order for contempt." The trial court denied Father's counsel's request to delay his commitment to allow him to attend his military training that weekend.[6]

The trial court entered a Commitment Order for Civil Contempt, using the form order AOC-CV-110, Rev. 8-17. The order did not include any "additional findings" other than the pre-printed text of the form. The trial court ordered Father to be "immediately . . . taken into custody" until he "purges himself[ ] of contempt" by paying $4,600.00 to Mother. The order also set a date for review on 10 February 2023, if Father was not sooner released. According to the transcript, Father was immediately taken into custody.

From 1 February through May 2023, there was a series of court dates resulting in the entry of the four orders on appeal: (1) the 29 March 2023 Continuance Order; (2) the 29 March 2023 handwritten Memorandum of Order granting Mother's Motion to Modify Custody; (3) the 25 April 2023 Amended Commitment Order; and (4) the 30 May 2023 Formal Modification Order based on the 29 March 2023 hearing. Instead of reviewing the procedural history of these court dates and orders here and then repeating much of it later, we will include the relevant portions of this

---

[6] Later, in the memorandum from Father's commanding officer, Major Kirkpatrick, dated 11 May 2023, he confirmed that Father had

> already missed a battle assembly training from 3-5 February and our first annual training from 6-14 February, both of which were a vital training event for deployment preparation. . . . On the 24th of March I emailed and called [Father] ordering him to makeup his missed days on 28-29 March to make up his missed days from February.

information in the sections below addressing Father's appeals of the four orders.

## II.   Jurisdiction

We have appellate jurisdiction over Father's appeal for each of the four orders Father appealed.  This Court previously consolidated the four appeals by order issued on 19 June 2023.

> A final judgment is one which disposes of the cause as to all the parties, leaving nothing to be judicially determined between them in the trial court. An interlocutory order is one made during the pendency of an action, which does not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire controversy.

*Duval v. OM Hosp., LLC*, 186 N.C. App. 390, 392, 651 S.E.2d 261, 263 (2007) (quotation marks omitted) (quoting *Veazey v. City of Durham*, 231 N.C. 357, 361-62, 57 S.E.2d 377, 381 (1950)).  We will address appellate jurisdiction for each order on appeal in chronological order.

First, on 25 April 2023, Father timely filed a notice of appeal from the 29 March 2023 Continuance Order.  Although the order was interlocutory and not immediately appealable, he timely filed notice of appeal.  *See Watson v. Watson*, 288 N.C. App. 265, 267, 885 S.E.2d 858, 860 (2023) ("[W]hen a litigant elects to appeal an interlocutory judgment resolving a domestic claim while other claims are pending, the litigant still must comply with Rule 3 of our Rules of Appellate Procedure, requiring that the notice of appeal be filed 'within thirty days after entry of the judgment.'" (brackets omitted) (quoting N.C. R. App. P. 3(c)(1))).

Second, on 25 April 2023, Father filed a notice of appeal from the Memorandum of Order regarding modification of custody entered on 29 March 2023. He contends the Memorandum of Order was a final appealable order because it modified the previous custody orders and was not a temporary order, although it stated "Formal Order Pending." The Memorandum of Order also directed that "[a] formal judgment/order reflecting the above terms will be prepared by (sic) and submitted no later than 30 days for signature by a judge." If it was a final appealable order, Father contends the trial court lacked jurisdiction to enter the Formal Modification of Order since his notice of appeal had divested the trial court of jurisdiction.

Mother concedes that the Memorandum of Order is "a permanent order in that it memorialized the district court judge's ruling as it was given in [c]ourt on that date." But she argues that the Formal Modification "Order entered on [30 May 2023] contains no contradictory language to the Memorandum of Order . . . ; both are part and parcel of the same permanent order as intended by the district court and should be taken together." She cites no authority for the two orders to be "taken together" and essentially treated as one order, and we are not aware of any such authority. But under the unusual circumstances of this case, we need not determine whether the Memorandum of Order was interlocutory or an immediately appealable order such that Father's notice of appeal divested the trial court of jurisdiction to enter the Formal Modification Order. Either way, Father timely filed a notice of appeal from the Memorandum of Order, preserving his right to appeal either immediately or upon

entry of a final order. Since we have determined that the trial court erred by denying Father's Motion to Continue the hearing on modification of custody, we are required to vacate both the Memorandum of Order and the Formal Modification Order for that reason.

The third order on appeal is the 25 April 2023 Amended Commitment Order. Father timely filed a notice of appeal from this order on 10 May 2023. Although Father was not subject to immediate commitment under the Amended Commitment Order, it was immediately appealable. *See Guerrier v. Guerrier*, 155 N.C. App. 154, 158, 574 S.E.2d 69, 71 (2002) ("The appeal of any contempt order, however, affects a substantial right and is therefore immediately appealable." (citing *Willis v. Power Co.*, 291 N.C. 19, 30, 229 S.E.2d 191, 198 (1976))).

The fourth order on appeal is the Formal Modification Order entered on 30 May 2023. Father timely filed a notice of appeal from the Formal Modification Order on 12 June 2023. We therefore have appellate jurisdiction to review all four orders.

## III. Analysis

Resolution of Father's arguments regarding the Motion to Continue on Mother's Motion to Modify Custody will also resolve his arguments regarding the Memorandum of Order and the Formal Modification Order. His arguments regarding the Motion to Continue are based on SCRA Section 3932(b)(2)'s requirements.

### A. Appeal of the Continuance Order

#### 1. *Procedural History Relevant to Motion to Continue*

- 11 -

On 1 February 2023, Mother filed a notice of hearing for 29 March 2023 for her "Motion to Modify Child Custody filed [25 February 2022]" (Motion to Modify Custody). Based on the schedule of military training dates Father provided at the 31 January 2023 contempt hearing, Father was not originally scheduled to attend training on 29 March 2023. The parties had discussed this date to set the hearing on Mother's Motion to Modify Custody during the court appearance on 31 January 2023.

On 3 February 2023, Father (who was still in jail at this point) filed a *pro se* "Motion to Stay Contempt Comitment (sic) for Civil Contempt" (Motion to Stay Contempt Commitment) under 50 U.S.C.A Section 3934. Father alleged that he "is in the military service of the United States for various training periods from now until October 2023 then deployed in the national interest from October 2023 to June 2024, as authorized by the [SCRA], [50 U.S.C.A. § 3901.]" Father requested

> [t]hat the Order of Commitment for Civil Contempt entered on [31 January 2023] be stayed and allowing [Father] to stay out of confinement until 90 day[s] after [he] returns from deployment in June 2024, or alternatively allowing [Father] release from confinement for his pre-deployment military training obligations as stated in his commander's memorandum and his deployment from October 2023 to June 2024.

Father's Motion to Stay Contempt Commitment included two exhibits. Exhibit A is a memorandum from Father's commanding officer, Major Matthew Kirkpatrick, with the "SUBJECT: Staff Sergeant Matthew Roybal Military *Obligation*." (Emphasis added.) The memorandum stated:

1. The purpose of this memorandum is to discuss the deployment and training status of [Father].

2. [Father] is scheduled for deployment to West Africa for the following dates, 6 October 2023 to June 2024. *He is also required to attend all training required leading up to this deployment starting 3 February 2023 (see enclosed training schedule).* [Father] is a central member of this mission as a team Sergeant and subject matter expert in our mission's area of responsibility. His absence will adversely affect the readiness of the company and his team since he is a primary trainer for the unit. His presence is vital for unit preparedness and for the success of this mission in support of national interest.

3. *Under AR 135-91,* [*Father*] *is required to attend all scheduled training assembles and annual training periods.*[7] Missing these trainings will cause a negative impact on [Father's] military career, and the readiness of the unit, causing him to be labeled as Unsatisfactory Participation. If his absence continues it will result in adverse action, which could include discharge with an other than honorable characterization of discharge IAW AR 135-92, para 4-7b(2).[8]

4. [Father] is the most reliable Non-Commissioned officer in my unit, he displays an unmatched work ethic and his drive and knowledge play a key role in the accomplishment of the unit's mission. He[] selflessly sacrifices his time on

---

[7] Army Regulation 135-91, effective 14 April 2016, is entitled "Service Obligations, Methods of Fulfillment, Participation Requirements, and Enforcement Provisions."

[8] IAW means "in accordance with." It appears 135-92 is a typographical error and this should refer to Army Regulation 135-91.4-7 (the same section cited at the start of paragraph 3) which is entitled "Unsatisfactory Participation as an individual mobilization augmentee." It provides that "[a]n IMA will be determined to be an unsatisfactory participant subject to the enforcement provisions of chapter 6, under the following conditions: . . . (2) If required to attend 48 IDT periods, Soldiers accrue nine or more unexcused absences in any 12 month period." Father is an IMA, or an Individual Mobilization Augmentee, a member of a category of reservists in the Individual Mobilization Augmentation Program, or, in civilian English, a member of the Army Reserve. *See* Army Regulation 140-145, *Individual Mobilization Augmentation Program*, 21 April 2022.

countless occasions in order to ensure his peers and subordinates a[re] trained and ready.

5. By allowing him to attend his military training obligations it will provide him income needed to help satisfy his payments.

6. Thank you for your understanding and consideration. Please feel free to contact me at [phone number redacted] or via email at [email address redacted].

(Emphasis added.)

The training schedule attached to the memorandum included a table of training dates for "*mandatory* Company Battle Assemblies for Fiscal Year 2023" ranging from 7 January 2023 to Father's deployment date of 6 October 2023. (Emphasis added.) This schedule identified dates when Father would and would not be available to participate in trial court proceedings.[9] Mother's counsel and the trial court both referred to this schedule during each later hearing when Father's Motion to Continue was addressed.

A third party made Father's $4,600.00 purge payment on 6 February 2023. He was released from incarceration that day and filed a notice of withdrawal of his motion to stay the Order of Commitment on 9 February 2023.

On 28 February 2023, Father again appeared before the trial court as required by the Contempt Order regarding the February payment due. The trial court issued

---

[9] Exhibit B is a copy of 50 U.S.C.A. § 3934, a section of the SCRA addressing stays when a servicemember "is materially affected by reason of military service in complying with a court judgment or order." This section addresses the servicemember's ability to comply with a court order or judgment.

an order to continue the matter, finding "[Father] appeared on [28 February 2023] and indicated at the call of this matter that he had $3,000.00 to pay towards the $4,600.00 payment." This order required Father to pay the $3,000.00 by 2:00 p.m. on 29 February and to pay the "[t]he remaining $1,600.00 of the February purge payment" by 28 March 2023 and Father was to appear for calendar call on 28 March 2023 to provide proof of payment.[10] Father was ordered to "appear at the Orange County calendar call" 29 February 2023, at 2:00 p.m., to provide proof of payment or an order for arrest would be issued.

On 27 March 2023, Father, again acting *pro se*, filed his Motion to Continue on a form entitled "Motion and Order to Continue"[11] seeking to continue the hearing set for 29 March 2023 on Mother's Motion to Modify Custody. Father's Motion to Continue alleged that Mother had noticed these motions for hearing on 22 December 2022, although we note that the notice of hearing for 29 March 2023 for Mother's

---

[10] Father was also ordered to attend calendar call on 28 March 2023 by the Contempt Order.

[11] The "Motion and Order to Continue" appears to be a form with spaces for the motion, and at the bottom, a space for the trial court's ruling. The first part of the motion included Father's allegations and motion to continue and it was filed at 3:25 p.m. on 27 March 2023. At the bottom of the form is a section for the trial court to rule on the motion by checking one of two boxes, either "denied" or "allowed and set for _____." Based on the transcript of the hearings on 29 March 2023, the trial court signed the order portion of the document denying the motion on 29 March 2023, but the "Order" portion of the motion was not separately clocked in with the Clerk of Superior Court as being filed on that date. Because an order is entered when it is written, signed, and filed, and the order portion was signed on 29 April 2023, it was entered on 29 April 2023. *See Stevens v. Guzman*, 140 N.C. App. 780, 782, 538 S.E.2d 590, 592 (2000) ("A judgment or order in a civil action is entered 'when it is reduced to writing, signed by the judge, and filed with the clerk of court.'" (citations omitted) (quoting N.C. Gen. Stat. § 1A-1, Rule 58 (1999))).

Motion to Modify Custody was actually filed on 1 February 2023.[12]  Father alleged as the basis for the Motion to Continue as follows:

> As was stated as a possible issue when the court date was picked the [Father]'s mandatory military duty days were extended for mandatory training for a pending deployment in September 2023. The original training date was [30 March 2023]. The report time was moved to midnight [27 March 2023]. Attached hereto is EXHIBIT A, a true correct copy of email communication from [Father's] Commander ordering him to report for military service prior and during the scheduled hearing date. Leave to attend the hearing is not authorized or allowed.

> This case has previously been continued 0 times.

Attached to his Motion to Continue, Father included an email exhibit entitled "Upcoming BA" from his commanding officer Major Kirkpatrick stating, "I need you to come in before next weeks BA to make up RST dates IOT help prepare the unit for April and [M]ay[']s upcoming training. 28 and 29 March leading into 30 Mar-2 April BA."[13]  This email included Major Kirkpatrick's email address and phone number.

On 28 March 2023, Father was to appear for calendar call as directed by the 28 February continuance order and the Contempt Order regarding his purge payments under both orders.  Mother and her counsel appeared for this calendar call

---

[12] The hearing on contempt was held on 22 December 2022 and the Contempt Order was entered that same day, but our record does not indicate any notice of hearing filed on that date.  The Parties did discuss possible hearing dates and determined 29 March 2023 was an available court date as Father was not scheduled to attend military training that day under the schedule available at that time.

[13] Military communications use many acronyms.  BA means "battle assembly."  RST means "rescheduled training."  IOT can have several possible meanings in the military context, but in this email, it appears to mean "in order to."

by WebEx. Father did not appear. The trial court noted that it had received Father's Motion to Continue and asked Mother's counsel if she would prefer for the trial court to issue an order for his arrest immediately or wait to "address it tomorrow" since the custody modification motion was set for hearing then. Mother's counsel addressed Father's Motion to Continue and stated her belief that Father's service on March 28 and 29 was not "considered active military duty" under the SCRA. She acknowledged Father's training schedule as provided by Major Kirkpatrick with Father's previous motion to stay filed in February 2023 but argued that the 24 March 2023 email from Major Kirkpatrick was not sufficient to constitute an order requiring him to go to training on 28 March 2023. The trial court announced that Father's Motion to Continue was denied but did not mention any findings regarding the reasons for denial. The trial court also announced that an order for Father's arrest on the contempt for failure to pay the purge payments due under the Contempt Order would be issued immediately.

The next day, on 29 March 2023, Mother's Motion to Modify Custody was called for hearing. Father was not present and he was not represented by counsel. At the start of the hearing, the trial court inquired again about the SCRA. Mother's counsel presented arguments regarding the SCRA and whether Father was entitled to a stay. She acknowledged that Father was a "member of the Army" but contended that he was not technically on "active duty." She acknowledged Father had presented an email from Major Kirkpatrick requiring him to report for duty on 27 March 2023, but

stated that she had run a status report online and the report did not indicate Father was on "active duty" as of 28 March 2023. She presented the "Status Report Pursuant to Servicemembers Civil Relief Act" as of 28 March 2023 to the trial court, but she acknowledged she "did not do an affidavit" regarding Father's military status.[14]

The trial court announced it would sign the Continuance Order based on the hearing held on the day before. The Continuance Order did not include any findings, but in the hearing, the trial court stated that Father may be at "mandatory training" but not "active duty" and the email from his commanding officer did not "say anything was mandatory." The trial court also stated that "he had plenty of time to make" a request to reschedule the training. The trial court signed the bottom section of Father's Motion to Continue, checking the box indicating that "This Motion to Continue is: Denied."

The trial court then held the hearing on Mother's Motion to Modify Custody. During Mother's testimony, for the first six pages of the transcript, she testified about Father's military service and the difficulties they had had in scheduling visitation. One of the provisions of the prior custody order was that if Father's military duty would be less than 30 days, she and Father would "just have to figure [visitation] out"

---

[14] The North Carolina Administrative Office of the Courts has promulgated a "Servicemembers Civil Relief Act Affidavit" based on both the North Carolina Servicemembers Civil Relief Act, N.C. Gen. Stat. § 127B-24 to § 127B-25, and the SCRA, Form AOC-G-250, Rev. 5/20. The Status Report obtained from the SCRA Website "maintained by the Department of Defense" is to be attached to the affidavit, if the affiant has used the SCRA Website to determine the party's federal military status. *See* AOC-G-250, Rev. 5/20.

and if they did not agree on a schedule, they were to "work with the [parenting coordinator]." She also testified about his current military duty, as he could not pick up Jay from camp as he was "supposed to" on that very day, 29 March 2023, because "clearly he's in Virginia."

At the end of the hearing, the trial court entered a handwritten Memorandum of Order granting Mother's Motion to Modify Custody. The Memorandum of Order stated that a formal order was "to be prepared by [Mother's] counsel with findings of fact and additional decretal provisions." It also directed that a "formal judgment/order reflecting the above terms" would be "prepared by (sic) and submitted no later than 30 days for signature."

On 25 April 2023, Father filed a timely notice of appeal from the 29 March 2023 Continuance Order.[15] The next day, on 26 April 2023, Father filed another notice of appeal from the Memorandum of Order.

## 2. *Standard of Review for Continuance Order Under Section 3932(b)*

We will first address Father's appeal of the trial court's Continuance Order. Father's *pro se* Motion to Continue to did not cite any specific statute or rule but included allegations and information from his commanding officer regarding his

---

[15] As noted above, the document was filed-stamped on 27 March 2023, but the trial court signed the "Order" section of the document on 29 March 2023. An order is "entered" under Rule 58 of our North Carolina Rules of Civil Procedure after it has been signed *and* filed. N.C. Gen. Stat. § 1A-1, Rule 58 ("[A] judgment is entered when it is reduced to writing, signed by the judge, and filed with the clerk of court[.]").

military service, referring to the information he had provided in February about his 2023 training schedule, and an email from his commanding officer directing him to report for training on 28 and 29 March 2023.

In his brief, Father notes that his *pro se* Motion to Continue the hearing set for 28 March 2023 could be construed as either a motion under Rule 40(b) of our North Carolina Rules of Civil Procedure or a motion under the SCRA. Under Rule 40(b),

> [a] continuance may be granted only for good cause shown and upon such terms and conditions as justice may require. Good cause for granting a continuance shall include those instances when a party to the proceeding, a witness, or counsel of record has an obligation of service to the State of North Carolina.

N.C. Gen. Stat. § 1A-1, Rule 40(b). Although it may be possible to construe the Motion to Continue as a motion under Rule 40(b), Father did not cite this rule in support of his Motion to Continue and neither Mother's counsel nor the trial court ever mentioned Rule 40(b) during the hearings on Father's Motion to Continue.[16] Instead, even when Father was not present for the hearing to advocate for his position, both the trial court and Mother's counsel understood and addressed Father's Motion to Continue as falling under the SCRA.

We agree with Father that the Motion to Continue should be considered as a motion to stay the custody proceedings under the SCRA. The distinction between a

---

[16] The motion was addressed at both the hearing on the Motion to Continue on 28 March 2023 and on the day of the hearing on modification of custody on 29 March 2023.

motion to continue under Rule 40(b) and a motion to stay under the SCRA is important because the standards of review for motions under Rule 40 and under the SCRA may not be the same. Normally, a motion for continuance under Rule 40 is reviewed for an abuse of discretion.[17] *See Draughon v. Harnett Cnty. Bd. of Educ.*, 166 N.C. App. 464, 466, 602 S.E.2d 721, 723 (2004) ("It is within the trial court's discretion to grant or deny a motion for a continuance, and that ruling will not be overturned absent a showing of abuse of discretion. Generally, continuances are not favored . . . , and therefore, the trial court should only grant a continuance where the moving party demonstrates 'good cause and upon such terms and conditions as justice may require.' The burden of proof rests on the moving party to demonstrate sufficient grounds justifying the continuance. When ruling on a motion to continue the trial judge must consider not only the grounds given for the motion, but whether the moving party has acted with diligence and in good faith, and may consider facts of record as well as facts within his judicial knowledge.").

In *Boone v. Lightner*, the United States Supreme Court reviewed a trial court's denial of a servicemember's application to stay proceedings under the SSCRA for an

---

[17] We are referring to motions to continue under Rule 40 generally. No case has addressed the denial of a continuance under Rule 40 where a party has asserted that he had "good cause" for continuance because the party "has an obligation of service to the State of North Carolina." N.C. Gen. Stat. § 1A-1, Rule 40(b). And no case has addressed whether military service should be considered as an "obligation of service" under Rule 40(b), and we note that the rest of the rule states a "continuance requested to fulfill an *obligation of service* by carrying out any duties as a member of the General Assembly, or service on the Rules Review Commission or any other board, commission, or authority as an appointee of the Governor, the Lieutenant Governor, or the General Assembly, must be granted." *Id.* (emphasis added).

abuse of discretion. *See* 319 U.S. 561, 568 (1943) ("The legislative history of its antecedent shows that this clause was deliberately chosen and that judicial discretion thereby conferred on the trial court instead of rigid and undiscriminating suspension of civil proceedings was the very heart of the policy of the Act." (footnote omitted)). But the SSCRA, a precursor to the SCRA, specifically provided that whether to stay proceedings was "in the discretion of the [trial] court." *Id.* at 564 (quotation marks omitted).

The current SCRA, as applicable to this case, was adopted in 2003. The purpose of the SCRA is:

> (1) to provide for, strengthen, and expedite the national defense through protection extended by this chapter to servicemembers of the United States to enable such persons to devote their entire energy to the defense needs of the Nation; and
>
> (2) to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service.

50 U.S.C.A. § 3902 (2003).

When a servicemember requests a stay of court proceedings under Section 3932(b)(2), the current language does not grant the same scope of discretion as given to the trial court in the SSCRA. Instead, the SCRA uses mandatory language, stating that a stay "shall" be issued when an applicant has satisfied the "[c]onditions for stay" outlined in Section 3932(b)(2). 50 U.S.C.A. § 3932(b)(2).

North Carolina courts have never addressed the standard of review of denial

of a motion for stay or continuance under the SCRA. The Kentucky and Maryland

Courts of Appeals have interpreted the language of the SCRA as being "mandatory"

and have reviewed denials of a proper motion to stay under the SCRA *de novo*.[18] *See*

*Wood v. Woeste*, 461 S.W.3d 778, 782 (Ky. Ct. App. 2015) ("In interpreting Section

[3932], our sister courts have held the SCRA 'leaves no room for judicial discretion.'

If a service member complies with the requirements for a stay, it is required that the

trial court grant a stay." (citation omitted)). In contrast, one court, the Alaska

Supreme Court, has stated that denial of a motion to stay under the SCRA is reviewed

for an abuse of discretion:

> A trial court's interpretation of the provisions of the
> [SCRA] is a matter of law, which we review de novo using
> our independent judgment. We have not previously
> addressed the standard that governs the review of a trial
> court's decision whether to stay a proceeding under the
> [SCRA]. In *Boone v. Lightner*, the United States Supreme
> Court reviewed a trial court's decision not to continue a
> proceeding under the [SSCRA], the precursor to the
> [SCRA], for abuse of discretion. We have also recognized
> that the abuse of discretion standard governs the review of
> a trial court's decision whether to stay a proceeding in
> other contexts. We therefore conclude that a trial court's
> decision whether to grant a stay under the [SCRA] is
> reviewed under the abuse of discretion standard.

*Childs v. Childs*, 310 P.3d 955, 958 (Alaska Ct. App. 2013) (footnotes omitted).

---

[18] Most cases from other states have addressed the issue under the 1940 SSCRA, not the current SCRA as adopted in 2003. Again, under the SSCRA, the trial court had discretion as to whether to grant a stay.

In the *Childs* case, the Alaska Supreme Court relied on *Boone v. Lightner*, which was decided under the SSCRA, not the SCRA, and under the SSCRA granting a stay was clearly in the discretion of the trial court. *See id.*; *see also Boone*, 319 U.S. at 569 ("[W]e are unable to ignore or sterilize the [SSCRA] clause which plainly vests judicial discretion in the trial court."). In addition, in the *Childs* case, the Court noted that the servicemember-father did

> not argue on appeal that his ability to participate in the child support modification proceeding was materially affected by his military service. And the record does not include any evidence, such as a communication from [the servicemember-father]'s commanding officer, suggesting that his military duties prevented him from participating in the proceeding. In fact, [the servicemember-father] actually participated in the modification proceeding, filing an opposition in the superior court, raising legal arguments, and providing supporting documents including pay stubs, W-2s, and tax returns. [The servicemember-father] therefore was not entitled to invoke a stay under [the SCRA].

310 P.3d at 960 (footnote omitted). And since the servicemember-father in *Childs* did not file a motion under the SCRA with the proper documentation to invoke this protection, and did not argue that his ability to participate in his child support modification hearing was materially affected by military service, we consider the statement of the standard of review for a motion under the SCRA as dicta, which was not necessary for the ruling in *Childs*. *See Hayes v. City of Wilmington*, 243 N.C. 525, 536, 91 S.E.2d 673, 682 (1956) ("In every case what is actually decided is the law applicable to the particular facts; all other legal conclusions therein are but *obiter*

*dicta.*" (citation and quotation marks omitted)).

None of the cases from the other states are binding on this Court, but we find the Kentucky and Maryland cases to be more persuasive since they are based on the current provisions of the SCRA. *See State v. Williams*, 232 N.C. App. 152, 157, 754 S.E.2d 418, 422 (2014) ("While we recognize that decisions from other jurisdictions are, of course, not binding on the courts of this State, we are free to review such decisions for guidance." (citation and quotation marks omitted)). The Alaska case overlooks the differences between the statutory language of the SSCRA and the SCRA, and in the *Childs* case, the servicemember-father merely requested a stay under the SCRA without providing any information required by the SCRA. Based on the statutory language and the more persuasive cases interpreting the SCRA, we conclude the standard of review for the denial of a proper motion to stay under the SCRA is *de novo*.

Based on Father's Motion to Continue, the trial court proceedings, and Mother's counsel's arguments at the hearing, we have no reason to treat Father's Motion to Continue as anything but a motion to stay under the SCRA. Before the trial court, there was never any question that Father was requesting a continuance or stay under the SCRA because he was required to attend several training dates leading up to his October 2023 deployment. No one ever mentioned Rule 40. Mother has not challenged on appeal Father's qualification as an applicant "in military service" under the SCRA, 50 U.S.C.A. § 3932(a)(1), nor did she make this argument

to the trial court.  Instead, the transcript makes clear that both Mother and the trial court understood Father's Motion to Continue to be based on the SCRA and his need to attend training for the upcoming October 2023 deployment.

Even when Father was not present or represented for the hearing on his Motion to Continue, Mother's arguments against Father's Motion to Continue focused *entirely* on the SCRA.  She began her argument noting that she had to pull up the SCRA "this morning because it's been a minute since I've looked at it in this case.  And the key with this is that [Father] is not considered active military duty."  She went on to discuss the schedule of training dates and the Memorandum from Major Kirkpatrick that Father had filed in February 2023.  We therefore review the trial court's denial of the Motion to Continue *de novo*.

### 3.  *Conditions for Stay Under Section 3932(b)(2)*

We must now consider whether Father's Motion to Continue met the requirements of a motion to stay under the SCRA, as Mother contends Father did not provide the information required by the SCRA.  Father argues that the information he provided to the trial court in his 27 March 2023 Motion to Continue, along with the other information he had filed with his previous motion, satisfied the "[c]onditions for stay" of Section 3932(b)(2) of the SCRA and he was entitled to a stay of the custody modification hearing.

In her brief on appeal, Mother contends that Father's motions did not "set forth the necessary facts" under Section 3932(b)(2) to trigger stay protections afforded

under the SCRA. Her argument in her brief focuses only on Major Kirkpatrick's 24 March 2023 email, but before the trial court both Mother's counsel and the trial court discussed and relied on the email along with Major Kirkpatrick's previous memorandum and the training schedule he had provided with the memorandum. Mother's brief acknowledges the discussion of the dates of Father's military training at the hearing on 31 January 2023, but she contends these dates were simply "military training, please note not military duty or deployment." Mother's brief does not address any of the relevant definitions of "military service" or the actual language of 50 U.S.C.A. Section 3911. Most of her argument is based on the fact that the Status Report did not say Father was on "active duty" as of 28 March 2023, but as we will discuss below, neither the law nor the undisputed facts support Mother's argument.

Mother's brief also conflates the issue of continuance of the child custody modification hearing with issues related to Father's child support obligation. Father's Motion to Continue sought to continue or stay the hearing on Mother's *Motion to Modify Custody* set for 29 March 2023; this was the first time the Motion to Modify Custody had been set for hearing. Mother inexplicably argues that Father's "Motion to Continue was pursuing the goal of deferring his child support responsibilities; justice is the support of these minor children." The Contempt Order set 28 March 2023 as the date for Father to appear regarding the contempt purge payment. But *child support* was not set to be considered at the 29 March 2023 hearing, and it was not addressed at that hearing. Ultimately, Mother argues that

the trial court did not abuse its discretion by denying the continuance

> simply on the basis that the party filing the motion was requested to be somewhere else at the same time as the hearing, because subscribing to that standard would defeat any semblance of judicial efficiency. Further, the [c]ourt made findings of fact surrounding the reasons for the denial of the Motion to Continue, which were also stated on record, in the [30 May 2023 Formal] Modification of Child Custody Order. [Father] had ample opportunity to be present in court to present his side of the custody argument. His failure to appear was the result of his choices.

The SCRA is a federal statute enacted to protect military servicemembers from "judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service." 50 U.S.C.A. § 3902. "This chapter applies to any judicial or administrative proceeding commenced in any court or agency in any jurisdiction subject to this chapter[,]" including state trial court proceedings. *Id.* § 3912. The courts that have addressed the SCRA (and its predecessor, the SSCRA) have consistently stated that it should not "be given [a] narrow interpretation, but should be construed liberally so as to achieve the broad purposes of Congress. All doubt should be resolved in favor of the soldier." *McEndy v. McEndy*, 318 Mass. 775, 777, 64 N.E.2d 435, 436 (1945) (citing *Blazejowski v. Stadnicki*, 317 Mass. 352, 354, 355, 58 N.E.2d 164 (1944); *Semler v. Oertwig*, 234 Iowa 233, 243, 12 N.W.2d 265 (1943); *Reynolds v. Haulcroft*, 205 Ark. 760, 763, 170 S.W.2d 675 (1943)).

Only one North Carolina case has discussed the importance of the SCRA,

although this case did not address the SCRA directly. The Supreme Court of North Carolina in *In re Branch*, 367 N.C. 733, 734, 767 S.E.2d 47, 48 (2015), addressed whether a trial court denied the defendant-servicemember a fair trial in accordance with his rights under the SCRA.

*Branch* arose from an appeal of an order of public reprimand from the Judicial Standards Commission of a trial judge for failure to appropriately inquire into the rights of the absent defendant under the SCRA and "imprudently relying upon the counsel for the opposing party in the matter for a determination of the rights afforded" to the absent defendant. *Id.* at 734, 767 S.E.2d at 48. The Supreme Court noted that in *Foster v. Foster*, Halifax County File No. 12–CVD–733, a domestic case under North Carolina General Statutes Chapter 50, the trial court entered a default judgment against the defendant-servicemember. *Id.* at 737, 767 S.E.2d at 50. This led to the disciplinary action against the respondent-judge. *Id.* at 734, 767 S.E.2d at 48. After service of the complaint, the defendant-servicemember sent a letter to the trial court regarding his military service. *Id.* at 735, 767 S.E.2d at 48-49. He stated:

> "legal counsel informs me that federal law requires a stay of proceedings for a minimum of 90 days for service members on active duty" and cited the SCRA. Defendant received this advice from a Judge Adjutant General officer stationed in Daegu, Korea.
>
> [I]n a separate letter also dated 16 July 2012 and filed 26 July 2012, [d]efendant's commanding officer also wrote the court to verify that [d]efendant's military service would preclude his participation in court proceedings until at least 30 April 2013 and to also request a stay of proceedings

> until that time, personally ensuring that [d]efendant would be able to participate in the next scheduled proceeding after 30 April 2013. The commanding officer, in his letter, wrote that he was "advised by legal counsel that federal law allows a stay of proceedings for service members on active duty when their ability to defend themselves is materially affected by their material service" and cited the SCRA. The commanding officer's letter explained "Until this date 30 April 2013, SFC Jason Foster is needed by this unit because he is essential to the mission" and further explained "In this instance, SFC's critical role in the national security mission of this command precludes his participation in court proceedings until April 30th, 2013. He will be unable to present any defense at all due to his duties."

*Id.* at 735, 767 S.E.2d at 49 (internal quotation marks and brackets omitted).

Well before the end of April 2013—the date the commanding officer had identified as the ending date of the defendant-servicemember's assignment—in August 2012, the plaintiff's counsel in *Foster* asked the trial court to enter an order requiring the unrepresented defendant-servicemember to provide certain information regarding his military service, and the trial court entered an order giving him a deadline to "provide further justification for his request for a stay." *Id.* at 737, 767 S.E.2d at 50 (internal quotation marks omitted). However, the defendant-servicemember apparently did not have notice of this hearing, and he did not receive the resulting order until "less than one week before the deadline" stated in the order. *Id.* Later, the trial court entered default judgments against the defendant-servicemember. *Id.*

We appreciate that *Branch* addressed a different situation than this case, but

no other case from the Supreme Court of North Carolina has addressed the current version of the SCRA,[19] so we find the description of the information provided to the trial court by the defendant-servicemember's commanding officer instructive for this case. Mother's counsel here argued to the trial court that Father's Motion to Continue the hearing on the Motion to Modify Custody should not be allowed because he was not technically on "active duty," despite the receipt of the commanding officer's memorandum stating Father's schedule of required training dates leading up to the deployment date and the email from his commanding officer about the revised dates. Here, the trial court noted (incorrectly)[20] that Father's commanding officer did not say the training was "mandatory"[21] but Section 3932(b)(2) does not require use of this word. The information Father and Father's commanding officer provided here is similar to the information noted in *Branch*. And in the *Foster* case, the defendant-servicemember apparently did not even file a formal motion for stay or continuance but instead provided the information required by the SCRA to the trial court in a

---

[19] *Boone v. Lightner*, 319 U.S. 561 (1943), which is one of very few cases from the United States Supreme Court addressing the 1940 SSCRA, arose from review of a North Carolina case.

[20] The memorandum from Major Kirkpatrick described the training dates as a military "obligation," "mandatory," and "required."

[21] In denying Father's Motion to Continue, the trial court stated during the hearing on 29 March 2023:
> Also the email from his – that was attached to his motion from the
> commanding officer, didn't say anything was mandatory, but just that
> he needed to be there early to make up for something he missed before.
> So – and I think that miss was due to his not complying with [the
> Contempt Order] and being incarcerated for a short period before.

letter from himself and from his commanding officer. *Id.* at 735, 767 S.E.2d at 49.

The provision of the SCRA controlling Father's Motion to Continue is Section 3932, entitled "Stay of proceedings when servicemember has notice." 50 U.S.C.A. § 3932. This section applies to

> any civil action or proceeding, including any child custody proceeding, in which the plaintiff or defendant at the time of filing an application under this section—
>
> (1) *is in military service or is within 90 days after termination of or release from military service*; and
>
> (2) has received notice of the action or proceeding.

*Id.* § 3932(a) (emphasis added). Subsection (b) sets out the details of the application for a stay of proceedings.

> (1) Authority for stay
>
> At any stage before final judgment in a civil action or proceeding in which a servicemember described in subsection (a) is a party, the court may on its own motion and *shall, upon application by the servicemember*, stay the action for a period of not less than 90 days, *if the conditions in paragraph (2) are met*.
>
> (2) Conditions for stay
>
> An application for a stay under paragraph (1) shall include the following:
>
>> (A) *A letter or other communication setting forth facts stating the manner in which current military duty requirements materially affect the servicemember's ability to appear and stating a date when the servicemember will be available to appear.*
>>
>> (B) *A letter or other communication from the*

> *servicemember's commanding officer stating that the servicemember's current military duty prevents appearance and that military leave is not authorized for the servicemember at the time of the letter.*

*Id.* § 3932(b) (emphasis added).

As to the first condition for protection by the SCRA, Mother does not dispute that Father is a "servicemember," defined for purposes of the SCRA as "a member of the uniformed services, as that term is defined in section 101(a)(5) of Title 10." *Id.* § 3911(1). It is undisputed that Father is a Staff Sargeant in the Army Reserves.[22]

Next, the servicemember must be "in military service or is within 90 days after termination of or release from military service." *Id.* § 3932(a)(1). "Military service" is defined by Section 3911 as:

> (A) in the case of a servicemember who is a member of the Army, Navy, Air Force, Marine Corps, Space Force, or Coast Guard--
>
> > (i) active duty, as defined in section 101(d)(1) of Title 10[.]

*Id.* § 3911(2)(A)(i). "Active duty" is then defined by 10 U.S.C.A. Section 101(d)(1) as

> full-time duty in the active military service of the United States . . . . Such term includes full-time training duty,

---

[22] A member of a reserve component who is ordered to report for military service is entitled to the rights and protections of this subchapter and subchapters II and III during the period beginning on the date of the member's receipt of the order and ending on the date on which the member reports for military service (or, if the order is revoked before the member so reports, or the date on which the order is revoked).

50 U.S.C.A. § 3917(a).

annual training duty, and attendance, while in the active
military service, at a school designated as a service school
by law or by the Secretary of the military department
concerned. Such term does not include full-time National
Guard duty.

10 U.S.C.A. § 101(d)(1).

"Active military service" is not further defined in Section 101 of Title 10, U.S. Code, but "active service" is defined as "service on active duty or full-time National Guard duty" in Section 101(d)(3). "Nothing in either the SCRA or the incorporated portions of 10 U.S.C. [Section] 101 suggests that a servicemember must be deployed or stationed abroad for the SCRA to apply." *Warta v. Porter, McGuire, & Kiakona, LLP*, 622 F. Supp. 3d 971, 982 (D. Haw. 2022).

Mother's primary argument is that Father did not meet the conditions for an application for stay as provided by Section 3932(b)(2). These conditions require that the servicemember must provide "a letter or other communication setting *forth facts stating the manner in which current military duty requirements materially affect the servicemember's ability to appear and stating a date when the servicemember will be available to appear*" and "a letter or other communication from the servicemember's commanding officer stating *that the servicemember's current military duty prevents appearance and that military leave is not authorized for the servicemember at the time of the letter.*" 50 U.S.C.A. § 3932(b)(2) (emphasis added). The memorandum from Major Kirkpatrick, the training schedule, and Major Kirkpatrick's email fulfill these conditions.

Mother's brief characterizes Major Kirkpatrick's 24 March 2023 email as an "unclear communication" that "requires farfetched inference to conclude that will be in a required military training on [29 March 2023]." We disagree that the email is "unclear," especially when read along with Major Kirkpatrick's first memorandum and the training schedule. The transcript of the hearing shows that Mother's counsel and the trial court considered all this information. Nor does it require "farfetched inference" to conclude Father was attending required training on 29 March 2023. It is clear from the transcripts of both 28 March 2023 and 29 March 2023 that Mother, her counsel, and the trial court all knew Father was attending military training on 29 March 2023. Mother's main argument to the trial court was that he was not on "active duty," and her contention on appeal is that his attendance at training was not "required." But Major Kirkpatrick's memorandum, the training schedule, and his email all state the training dates listed on the 2023 training schedule were "mandatory," an "obligation," and "required." Major Kirkpatrick added the training dates for 28 and 29 March to make up for training Father missed when the trial court committed him for contempt and caused him to miss his required training dates of 3 through 5 February 2023.[23]

We understand that Mother and the trial court both had valid questions about Father's credibility on various matters, especially regarding Father's failure to pay

---

[23] Father had also requested, based on the SCRA, to delay his commitment for contempt on 3 February 2023, but the trial court denied his request, so Father missed his required training that weekend.

his child support in a timely manner. But Mother never raised any question about the credibility or validity of the memorandum, training schedule, or email from Major Kirkpatrick, nor was there any question that Father was actually attending military training on 28 and 29 March 2023. The Motion to Modify Custody had originally been scheduled for 29 March 2023 based on Father's availability as shown on the training schedule as of January 2023. Those dates changed after Father was incarcerated for contempt during his battle assembly training dates of 3 through 5 February 2023, so he had to make up those training dates. The trial court made no findings of fact in the Continuance Order, but the findings the trial court did make in the Formal Modification Order show the trial court did not question the validity of the memorandum and training schedule from Major Kirkpatrick, regardless of Father's credibility or lack thereof.

Because the trial court made no findings in the Continuance Order, Mother notes that in the 30 May 2023 Formal Modification Order, the trial court included some findings relevant to the denial of Father's Motion to Continue, finding that "[p]ursuant to" Father's training schedule, he "was not scheduled to be required to attend battle assemblies and in the event he was, he could have requested to split the training as evidenced" by his training schedule. The trial court also found Father "had ample time to request leave from any training as indicated in the memorandum." We could ignore Mother's argument based on these findings in the Formal Modification Order for several reasons.

First, Mother's argument is circular. She is arguing that Father's Motion to Continue should have been denied not based on findings made at the hearing on the Motion to Continue or in the Continuance Order but on findings the trial court made at the custody modification hearing Father could not attend *because* his Motion to Continue was wrongfully denied. Because we must vacate the Formal Modification Order due to the trial court's failure to allow Father's Motion to Continue under the SCRA and Father was not present at the custody modification hearing, we cannot rely on any findings in this order. But even if we considered the findings, these findings simply confirm that the trial court was aware of and considered Father's training schedule for 2023. And the trial court's finding that Father could have requested leave and that he was not required to attend the training on 28 March 2023 is not supported by that same evidence.

The trial court is correct that Father's training schedule indicated he could "request to split training" if needed. However, the same documents also stated that any request for split training had to be submitted "*at least 30 days prior* to the scheduled battle assembly." (Emphasis added.) It would have been impossible for Father to make a timely request for split training for 29 March 2023 since he did not learn until he received the 24 March 2023 email that he would have to go to training on 29 March 2023. The trial court's findings did not mention this 30-day requirement or the additional email communication from Major Kirkpatrick dated 24 March 2023, directing Father to come in for training on 28 March 2023.

Father argues the materials he submitted, which were "available to the trial court" at the 28 March 2023 hearing—and were referenced by both Mother's counsel and the trial court during the hearing—satisfied the conditions of Section 3932(b)(2) and thus this Court should conclude he was entitled to the stay. As noted above, Father directs us to his Motion to Stay Contempt Commitment filed 3 February 2023 in addition to his Motion to Continue filed 27 March 2023.

Other courts have considered a combination of several filings by a servicemember to fulfill the requirements of the SCRA. *See Hernandez v. Hernandez*, 169 Md. App. 679, 690, 906 A.2d 429, 435 (2006) (vacating judgment entered after trial court's denial of the servicemember's motions to stay hearing, after considering the servicemember's "first motion to stay the proceedings" filed 11 August 2004 with information regarding his duties, his orders, and a letter from his commanding officer; his second motion for stay filed 25 August 2004 with the same information as the first but through counsel; and his "third motion for stay" filed the day "before the scheduled trial" with another letter from his commanding officer regarding his military duty on 8 September 2004, the trial date. Looking at all these filings, the Court stated that "[t]herefore, by the time [the] appellant filed his third motion, he had submitted everything that [Section 3932](b)(2) requires"). And here, the trial court and Mother both repeatedly referred to and relied on the information from Major Kirkpatrick with both motions so it is appropriate for this Court to rely on the same information in reviewing Father's argument.

According to the original training schedule issued in January 2023, Father was not required to attend any training sessions that would have interfered with his ability to attend the 29 March 2023 custody modification hearing. However, in the Motion to Continue filed on 27 March 2023, Father included as an exhibit an email communication from Major Kirkpatrick dated 24 March 2023, indicating he needed to "come in" early on "28 and 29 March leading into the 30 Mar[ch]-2 April" scheduled training.

At the hearing on 28 March 2023, Mother's counsel acknowledged that Father had presented an email from his commanding officer requiring him to report for duty on 27 March 2023, but stated that she had run a "Status Report" online and that the report did not indicate Father was on "active duty" as of 28 March 2023. The next day at the hearing, she also presented the "Status Report Pursuant to Servicemembers Civil Relief Act" as of 28 March 2023, but she acknowledged that she "did not do an affidavit" regarding Father's military status. The absence of an affidavit supporting the Status Report is telling, since there was never any dispute that Father was attending training that day, and both Mother and her counsel were aware that Father was not present because he was actually attending military training as directed by his commanding officer.

Mother is correct that the "Status Report Pursuant to Servicemembers Civil Relief Act" submitted to the trial court by Mother on 28 March 2023 does not identify any "active duty" service dates. But we must consider the entire document, not just

the small portion Mother stresses. The second page of the Status Report notes the potential limitations of the Status Report and encourages users to "obtain further verification" if there is an assertion that the servicemember is "entitled to the protections of the SCRA":

> The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.
>
> The DoD strongly supports the enforcement of the [SCRA] (formerly known as the [SCCRA]. DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. *In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service.*[24] *Service contact information can be found on the SCRA website's FAQ page (Q35) via this URL: https://scra.dmdc.osd.mil/scra/#/faqs. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. § 3921(c).*
>
> This response reflects the following information: (1) The individual's Active Duty status on the Active Duty Status

---

[24] Father's commanding officer, Major Kirkpatrick, provided his contact information on several documents, including the email attached to Father's Motion to Continue. Mother's counsel and the trial court both referred to these documents, but there is no indication in the record that anyone ever sought to contact Major Kirkpatrick to "obtain further verification of the person's status" as recommended by the Status Report form.

Date (2) Whether the individual left Active Duty status within 367 days preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

**More information on "Active Duty Status"**

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1). Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available. In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs). Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

**Coverage Under the SCRA is Broader in Some Cases**
*Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate.* SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(d)(1).

*Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to*

> *make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction.* The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.
>
> Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected
>
> WARNING: This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester. Providing erroneous information will cause an erroneous certificate to be provided.

(Emphasis added.)

Mother's counsel informed the trial court that she did *not* file an affidavit with the Status Report she submitted to the trial court. We have addressed the Status Report in detail because Mother's brief stresses the importance of the Status Report: "This status report was presented by counsel for [Mother] at the March 28, 2023 calendar call and was referenced when Judge Cabe made her decision not to grant [Father]'s Motion to Continue . . . along with other evidenced (sic) as referenced in the court transcript." Mother's emphasis on the Status Report is disingenuous, as she conveniently did not file a sworn affidavit with the Status Report. Had she filed an affidavit it presumably would have included the same information Mother ultimately testified about the next day at the custody modification hearing—her

knowledge that Father was actually not present for the hearing due to his military service.

The North Carolina Administrative Office of the Courts has promulgated a form entitled "Servicemembers Civil Relief Act Affidavit." AOC-G-250, Rev. 5/20. This affidavit requires the affiant to state "under the penalty of perjury" their "personal knowledge" of whether the party identified on the affidavit is or is not "in the military service;" whether they have "received a copy of a military order" from the party; whether they did or did not use the "Servicemembers Civil Relief Act Website" to determine the military service status, and if so, to attach the results of that search to the affidavit. *Id.* The affidavit also includes a blank section for the affiant to state any facts supporting the affiant's statement about the party's military service. The form includes detailed instructions noting the requirements of the SCRA.[25] Based on the transcripts, both Mother and her counsel were aware Father had reported for his military duty on 27 March 2023, as directed by Major Kirkpatrick's email, and they did inform the trial court. However, Mother's counsel still argues Father was not technically on "active duty" and he was not "required" to attend training so the protections of the SCRA would not apply to him. But Father complied with the

---

[25] We note the information regarding SCRA affidavits on the back of the form addresses cases where the servicemember does not appear under 50 U.S.C.A Section 3931, proceedings where the service member "has not made an appearance." But the procedures under Section 3931 apply only where the servicemember has not received actual notice of the proceeding. Where the servicemember has received notice, as Father here did, Section 3932 applies.

requirements of Section 3932(b)(2).

There is no dispute that Father had submitted documentation from his commanding officer regarding the training dates for 2023 leading up to the October 2023 deployment. In addition, as the trial court noted, the trial court's previous commitment of Father on 3 February 2023 made him unable to attend his scheduled training on that date, necessitating the make-up dates on 28-29 March. Major Kirkpatrick stated Father had a vital role within his military unit and that his absence would "adversely affect" preparations for deployment. Father's attendance at training sessions would "materially affect" his ability to appear for the trial court hearing on 29 March 2023. 50 U.S.C.A. § 3932(b)(2)(A).

The SCRA also required that Father inform the trial court of when he would be available for court proceedings, and he did so. *See id.* The training schedule informed the trial court of dates Father would and would not be available to participate in proceedings. These training dates did not occupy all of Father's time leading up to his October 2023 deployment. In fact, he was unavailable only a few days of the year until his deployment to Africa in October. The trial court easily could have looked at Father's training schedule and found many other dates when he would be available to schedule the child custody hearing. Father satisfied the requirements of Section 3932(b)(2)(A) in providing a "communication" that both states how his military duty "materially affect[s]" his "ability to appear" for the 29 March 2023 hearing, as well "a date when [Father] w[ould] be available to appear." *Id.*

We also note that Father's Motion to Continue requested a continuance of the hearing set for 29 March 2023, not a "stay." Very few cases nationwide have addressed whether there is any relevant difference between asking for a "stay" and a continuance under the SSCRA or SCRA. Most cases address the 1940 SSCRA, and that statute did have important differences from the SCRA. Under the SSCRA, the trial court had discretion to grant a stay, but we agree with the Supreme Court of Alabama addressing motions to continue under the 1940 SSCRA: "We perceive of no sound reason to here draw nice distinctions between a continuance of the cause and a stay of the proceedings. For all practical purposes the results are the same." *Ex parte Taylor*, 247 Ala. 308, 311, 24 So. 2d 217, 219 (1945). Under the SCRA, an initial stay is for "not less than 90 days." 50 U.S.C.A. § 3932(b)(1).

As a practical matter, a 90-day stay may be more appropriate when a servicemember will be unavailable to attend to any action required in a court proceeding for an extended period, while a continuance may be more appropriate when the servicemember is unable to attend a hearing during a certain period but will be available soon after that date. Here, under Father's schedule of training as of 28 March 2023, he would have been available for a continued court date as soon as 7 April 2023. Or if the trial court granted a 90-day stay, until 27 June 2023, his training schedule showed he would be available on that date and he would be available for most days during the months of July, August, and September 2023.

On *de novo* review, because Father satisfied the elements of Section 3932(b)(2),

he was entitled to a mandatory stay of the trial court's child custody proceedings under the SCRA. The trial court erred in denying his Motion to Continue and by holding the hearing on Mother's Motion to Modify Custody on 29 March 2023.

### 4. *Denial of Father's Motion to Continue Under the SCRA was Prejudicial*

Father has also shown the trial court's denial of his Motion to Continue the hearing on modification of custody was prejudicial. As a general rule, to have the right to relief on appeal, an appellant must show prejudice from the denial of a motion to continue or to stay, whatever the legal basis of the motion:

> Regardless of whether the motion raises a constitutional issue or not, a denial of a motion to continue is only grounds for a new trial when defendant shows both that the denial was erroneous, and that he suffered prejudice as a result of the error.

*In re L.A.J.*, 381 N.C. 147, 149, 871 S.E.2d 697, 699 (2022) (citation and quotation marks omitted).

In cases under the SCRA, the requirement to show prejudice from the denial of a motion to continue has been recognized by many courts which have addressed the SCRA. For example, the Virgina Supreme Court noted:

> In the only Supreme Court decision interpreting this statute, the Court upheld the denial of a stay to a serviceman who was assigned to a job in Washington, D.C., and who was a party to litigation in North Carolina. While not holding that stays were automatic, the Court stated that, upon a serviceman's application for a stay, a trial court cannot deny a stay unless "the court be of opinion that (a defendant's) ability to defend is not materially

affected by military service."

*Lackey v. Lackey*, 222 Va. 49, 51, 278 S.E.2d 811, 812 (1981) (internal citations omitted). Although both *Boone* and *Lackey* were addressing the SSCRA, not the SCRA, the same rule applies under the SCRA. In the Formal Modification Order, the trial court made many findings of fact, without Father having an opportunity to be present for the hearing or to present his own evidence, and modified the custodial schedule for both children, granting Mother sole legal custody.

Although Kentucky's laws about child custody procedures and remedies differ from ours, in *Wood v. Woeste*, the Kentucky Court of Appeals described the prejudice to the father from the court's refusal to grant a stay under the SCRA and its entry of a temporary custody order:

> Likewise, [the] father's injuries are irreparable. While serving his country, [the] father was unable to appear and oppose [the] mother's motion. The purpose of the SCRA is to permit service members to "devote their entire energy to the defense needs of the Nation" by temporarily suspending judicial proceedings, including custody proceedings. 50 App. U.S.C. § 502[26] Holding a custody hearing in [the] father's absence after he properly filed a motion for an automatic stay directly contravenes the stated purpose of the SCRA. Even if [the] father will ultimately resume his role as residential custodian, the violation of the SCRA has already caused the harm sought to be prevented by its enactment which cannot be remedied on appeal.

---

[26] Same as current statute, now codified as Section 3902. 50 U.S.C.A. § 3902.

*Wood*, 461 S.W.3d at 783. As in *Wood*, here, the trial court's "violation of the SCRA has already caused the harm sought to be prevented by its enactment which cannot be remedied on appeal." *Id.*

Following the denial of Father's Motion to Continue the hearing, the trial court proceeded with the child custody hearing on 29 March 2023 and entered a handwritten Memorandum of Order granting Mother's Motion to Modify Custody that same day. Then, on 30 May 2023, the trial court entered its Formal Modification Order incorporating the same provisions as the Memorandum of Order but including findings of fact. Again, because Father was entitled to stay the child custody proceedings "for a period of not less than 90 days" due to his military service, the trial court erred in entering both the Memorandum of Order and the Formal Modification Order. The denial of Father's Motion to Continue under the SCRA violated the requirements of the SCRA and deprived Father of his right to appear and oppose Mother's Motion to Modify Custody, and the trial court's error was prejudicial. The only way to remedy this error is to vacate the Memorandum of Order and Formal Modification Order and remand for a new hearing.

**B. Amended Commitment Order for Civil Contempt**

The final order on appeal is the Amended Commitment Order of 25 April 2023. In this order, the trial court ordered that Father be "immediately . . . taken into custody by the sheriff of this county" and "remain in custody until he[] purges himself[] of contempt by" paying "$7,500 to the Orange County Clerk of Superior

Court to be disbursed to [Mother.]"

Father argues the trial court erred by entering the Amended Commitment Order because it did not hear evidence, consider his ability to pay, or make any findings regarding his current ability to pay the purge payment set in December 2022 at the time of the entry of the Amended Commitment Order in April 2023. Mother's brief essentially concedes this point; she states that "the trial court may have erred in issuing the [25 April 2023] Amended Commitment Order, but the [22 December 2022] Contempt Order on which it was based was not erroneous."

On 24 May 2023, the trial court held a hearing on Father's Motion to Stay Contempt Commitment. No evidence regarding Father's ability to pay the purge payment was presented at this hearing, but Father was represented by counsel and counsel for both Parties presented arguments. That same day, the trial court entered a "Conditions of Release and Release Order" (Release Order). This order was captioned as "State Versus Matthew Jason Roybal," although this is not a criminal matter, and was on AOC-CR-200.[27] This order stated:

> To The Defendant Named Above, you are ORDERED to appear before the Court as provided above and at all subsequent continued dates. If you fail to appear, you will be arrested and you may be charged with the crime of willful failure to appear. The defendant has been advised of charge(s) against him/her and his/her right to

---

[27] This form is intended for use in criminal cases. The statutory authority noted on the form is North Carolina General Statute Chapter 15A, Article 25, 26. These articles govern commitment of a criminal defendant to a detention facility pending trial and bail. Neither of these articles is applicable to a civil contempt proceeding.

communicate with counsel, family and friends.

Your release is authorized upon execution of your:

WRITTEN PROMISE to appear.

AOC-CR-200, Rev. 10/24

Under the section entitled "Additional Information," the trial court added: "[Father] was incarcerated for civil contempt. The commitment order is hereby stayed due to [Father]'s required military service. The contempt has not been purged."

Father filed a notice of appeal from the Amended Commitment Order only.

### 1. *The Amended Commitment Order is not Moot*

Father first argues his appeal from the Amended Commitment Order is not moot, despite the Release Order, because "the trial court found that [Father] continues to be in contempt" following his release from confinement, "and assuming [Father] comes back from deployment with child support still unpaid, the same issue could arise again." Mother concedes this issue is not moot, and we agree. The Release Order gave Father a temporary respite from the Amended Commitment Order based on his military service but did not purge his contempt or change the effect of the Amended Commitment Order. [28]

The trial court's Release Order did not render Father's appeal from the

---

[28] We note that by 24 May 2023, the trial court correctly understood that Father's military service dates as listed on the training schedule were in fact "required" and Father was entitled to a stay of commitment under the SCRA.

Amended Commitment Order moot.[29]  Because the trial court found Father continued

to be in contempt and his contempt had not been purged, he was subject to

commitment again upon his return from deployment and under the terms of the

Amended Commitment Order, could be imprisoned if he did not pay as ordered.

### 2. *Standard of Review*

On appeal from contempt proceedings, this Court's review is

> limited to determining whether there is competent
> evidence to support the findings of fact and whether the
> findings support the conclusions of law. Findings of fact
> made by the judge in contempt proceedings are conclusive
> on appeal when supported by any competent evidence and
> are reviewable only for the purpose of passing upon their
> sufficiency to warrant the judgment. However, if . . . the
> finding that the failure to pay was willful is not supported
> by the record, the decree committing [the] defendant to
> imprisonment for contempt must be set aside.

*Tigani v. Tigani*, 256 N.C. App. 154, 156, 805 S.E.2d 546, 548-49 (2017) (citations,

quotation marks, and brackets omitted).

### 3. *Ability to Pay*

Father argues the trial court erred in ordering his commitment because the

trial court did not make findings as to Father's present "ability to pay" in the

Amended Commitment Order.  Father also notes that the Contempt Order is not a

"show cause" order, which would provide "[Father] with an opportunity to be heard

---

[29] Although we assume Father has returned from his deployment, we have not been informed by the Parties that this issue has been rendered moot by Father's compliance with the Amended Commitment Order or for any other reason.

on the question of willfulness." Mother contends that

> [w]hile the [25 April 2023] Amended Commitment Order
> was not informed by literal contemporaneous findings of
> [Father]'s ability to pay, the Trial Court had substantially
> stratified the total outstanding amount in the Contempt
> Order such that [Father] would be able to make payments
> toward the total deficiency over a period of six (6) months
> after being in contempt of a previous order for more than
> two (2) years and after hearing evidence on the same.

Mother cites no law to support her argument that the trial court's finding of Father's

ability to pay in December 2022 could somehow satisfy its obligation to find his ability

to pay as of 25 April 2023 before ordering his commitment.

Under North Carolina General Statute Section 5A-21,

> [f]ailure to comply with an order of a court is a continuing
> civil contempt as long as:
>
> > (1) The order remains in force;
> >
> > (2) The purpose of the order may still be served by
> > compliance with the order;
> >
> > (2a) The noncompliance by the person to whom the
> > order is directed is willful; and
> >
> > (3) The person to whom the order is directed *is able
> > to comply with the order or is able to take reasonable
> > measures that would enable the person to comply
> > with the order*.

N.C. Gen. Stat. § 5A-21(a) (2023) (emphasis added). Further, North Carolina General

Statute Section 5A-23 explains that a trial court must make findings as to an "ability

to comply" under Section 5A-21(a):

> At the conclusion of the hearing, the judicial official must

enter a finding for or against the alleged contemnor on each of the elements set out in G.S. 5A-21(a). If civil contempt is found, the judicial official must enter an order finding the facts constituting contempt and specifying the action which the contemnor must take to purge himself or herself of the contempt.

N.C. Gen. Stat. § 5A-23(e) (2023). "[P]ursuant to [North Carolina General Statute Section] 5A-21, a trial court may not imprison a civil contemnor absent a finding of the contemnor's *present* ability to comply with the court order." *McBride v. McBride*, 334 N.C. 124, 131, 431 S.E.2d 14, 19 (1993) (emphasis added). In *Tigani v. Tigani*, this Court explained that:

> In order to find a party in civil contempt, the court must find that the party acted willfully in failing to comply with the order at issue. Willfulness constitutes: (1) an ability to comply with the court order; and (2) a deliberate and intentional failure to do so. Therefore, in order to address the requirement of willfulness, the trial court must make findings as to the ability of the contemnor to comply with the court order during the period when in default. Second, once the trial court has found that the party had the means to comply with the prior order and deliberately refused to do so, the court may commit such party to jail. *At that point, however, the court must find that the party has the present ability to pay the total outstanding amount.*

256 N.C. App. at 157, 805 S.E.2d at 549 (emphasis added) (citations, quotation marks, brackets, and ellipses omitted).

The Contempt Order includes provisions which may be considered as a "springing" contempt order. "Springing" contempt orders have been described by the

University of North Carolina School of Government as

> orders issued in child support enforcement proceedings to determine that a respondent is in civil contempt but stay incarceration and order the respondent to pay ongoing monthly payments until all arrears are satisfied. These orders often also provide that, if the respondent fails to make a monthly payment, the respondent is to be immediately arrested and incarcerated. The order for arrest and incarceration 'springs' into effect upon the respondent's future failure to comply with the monthly payment schedule.

Cheryl Howell, "*Contempt: NC Court of Appeals vacates a 'springing' order for arrest*," School of Gov't (10 July 2025), https://civil.sog.unc.edu/contempt-nc-court-of-appeals-vacates-a-springing-order-for-arrest/.

The Contempt Order required Father to appear for calendar call on several dates and show he had paid the amount due as of that date or be imprisoned. The Contempt Order did not allow for an evidentiary hearing as to Father's ability to pay. The Amended Commitment Order on appeal "sprang" into effect based on Father's failure to pay the "purge" payment set in December 2022 but due in April 2023. No matter the findings or provisions of the Contempt Order, the trial court must consider evidence and make findings as to Father's *present* ability to pay any purge payment before he can be committed for civil contempt.

> The trial court must find that the obligor has the ability to *fully comply* with any purge conditions imposed upon him. Indeed, a person in civil contempt holds the key to his own jail by virtue of his ability to comply with the court order. This Court has previously vacated a contempt order where the findings of fact did not support the conclusion of law

that [the] defendant has the *present ability* to purge himself of the contempt. Ability to comply has been interpreted as not only the present means to comply, but also the ability to take reasonable measures to comply. A general finding of present ability to comply is sufficient when there is evidence in the record regarding the contemnor's assets.

*Collins v. Holley*, ___ N.C. App. ___, ___, 919 S.E.2d 24, 34 (2025) (emphasis in original) (citations, quotation marks, and brackets omitted); *see also Bennett v. Bennett*, 71 N.C. App. 424, 427, 322 S.E.2d 439, 441 (1984) ("In order to hold a defendant in civil contempt the [c]ourt must find that the defendant presently possesses the means to comply with the order." (citation omitted)); *see also Abernethy v. Abernethy*, 64 N.C. App. 386, 387, 307 S.E.2d 396, 396-97 (1983) ("The civil contempt statute, [North Carolina General Statute Section 5A-21], does require that 'the person to whom the order is directed be able to comply with the order or be able to take reasonable measures that would enable him to comply with the order.' Our Supreme Court has insisted that the trial court must find 'that the defendant presently possesses *the means* to comply." (quoting *Henderson v. Henderson,* 307 N.C. 401, 408, 298 S.E.2d 345, 350 (1983))).

In the Contempt Order, the trial court ordered Father to make payments to Mother during the months of January through June of 2023 and also appear for calendar calls each of these months to provide proof of payment. Notably, the Contempt Order did not state that Father could appear and present evidence of his *inability* to pay; the Contempt Order specifically required him to appear and pay the

stated amount in full. If he failed to appear or to pay, he would be arrested and held until he purged contempt by paying the stated amount as established in December 2022. Father did not appeal the Contempt Order, so we cannot address the merits of the Contempt Order. We can, however, address the Amended Commitment Order on appeal.

Mother does not even attempt to argue that the trial court considered or made findings about Father's ability to pay as of 25 April 2023. Her brief admits "the trial court did not have contemporaneous evidence of [Father's] ability to pay on [25 April 2023,]" but focuses on the findings of fact in the Contempt Order. She argues that Father did not appeal the Contempt Order, which is true, but irrelevant to the issues raised in his appeal of the Amended Commitment Order.

In the Amended Commitment Order,[30] the trial court first states that "[t]his matter was heard before the undersigned Judicial Official *on an Order to Show Cause* why . . . [Father] should not be held in civil contempt for failure to comply with an order previously entered by the [c]ourt." (Emphasis added.) We first note that the matter was not heard on an order to show cause, as no order to show cause had been entered before Father's court date set for 25 April 2023.[31] The Contempt Order is not

---

[30] The Amended Commitment Order was on Form AOC-CV-110, Rev. 8-17, Commitment Order for Civil Contempt.

[31] The record before this Court does not include a show cause order for any contempt motion in this case.

a show cause order; it is a contempt order resolving Mother's "Motion for contempt filed August 11, 2021." As a contempt order, it sets forth the arrearages owed and sets dates for payments. But a contempt order cannot serve as an anticipatory automatic "show cause order" for future payments due because show cause orders can be issued only *after* the alleged contemnor has failed to comply with an order.

Under North Carolina General Statute Section 5A-23, a show cause order can be "issued on the motion and sworn statement or affidavit of one with an interest in enforcing the order, including a judge, and a finding by the judicial official of probable cause to believe there *is* civil contempt." N.C. Gen. Stat. § 5A-23(a) (emphasis added). Here, no motion or affidavit was filed after Father's failure to pay the payment due on 25 April 2023. At least "five days in advance of the hearing," *id.* § 5A-23(b), on 25 April 2023, there was no "finding by the judicial official of *probable cause* to believe there *is*[—present tense—]civil contempt." *Id.* § 5A-23(a) (emphasis added). The "civil contempt" or failure to comply with the Contempt Order could not happen until 25 April 2023, as this was the due date set by the Contempt Order. A show cause order could not be issued until after Father failed to pay as ordered.

Where a show cause order is issued, the burden of proof shifts to the alleged contemnor to show why he should not be held in contempt. *See Moss v. Moss*, 222 N.C. App. 75, 77, 730 S.E.2d 203, 204-05 (2012) (explaining that when civil contempt is initiated "'by the notice of a judicial official that the alleged contemnor will be held in contempt unless he appears at a specified reasonable time and shows cause why

he should not be held in contempt' . . . the burden of proof is on the alleged contemnor" (quoting N.C. Gen. Stat. § 5A-23(a)). If no show cause order is issued, the burden of proof remains on the aggrieved party: "A show cause order in a civil contempt proceeding which is based on a sworn affidavit and a finding of probable cause by a judicial official shifts the burden of proof to the defendant to show why he should not be held in contempt." *Tucker v. Tucker*, 197 N.C. App. 592, 594, 679 S.E.2d 141, 143 (2009) (citation and quotation marks omitted); *see also Moss*, 222 N.C. App. at 77, 730 S.E.2d at 205 ("However, when an aggrieved party rather than a judicial official initiates a proceeding for civil contempt, the burden of proof is on the aggrieved party, . . . because there has not been a judicial finding of probable cause." (citations omitted)).

Here, Father appeared as directed by the scheduled calendar call date set in the Contempt Order. If a show cause order had been entered, it would have shifted the burden of proof to the alleged contemnor, Father, and would have given him an opportunity to "show cause" why he should not be held in contempt. Here, no show cause order was issued and the burden of proof remained on Mother, as the party who originally moved to hold Father in contempt and to be committed for failure to pay child support. But there was no evidentiary hearing regarding Father's ability to pay and Mother presented no evidence.

We recognize the trial court in the Amended Commitment Order, as stated by the preprinted text of the form, also found that Father "has willfully failed and

refused to comply with the order entered on 12/22/2022 (date), and that [he] has sufficient means and ability to comply or take reasonable measures to comply. [Father] is, therefore, found to be in civil contempt of this [c]ourt." But as Mother's brief acknowledges, and the transcript confirms, no evidence was presented at the hearing. Even if we assume the trial court made a finding of fact as to Father's ability to pay as of 25 April 2023, the finding is not supported by the evidence because no evidence was presented. *See Crews v. Paysour*, 261 N.C. App. 557, 562, 821 S.E.2d 469, 472-73 (2018) ("Evidence is always required to support findings of fact, unless the parties have stipulated to the fact or the finding is subject to judicial notice, neither of which is present here. Thus, we cannot review the order to determine if the findings of fact are supported by the evidence because there is no competent evidence for the time period covered by those findings of fact." (footnote omitted)).

In the Amended Commitment Order, under the "additional findings" section of the form, the trial court added findings regarding the chronology of Father's payments due under the Contempt Order and payments he had made or not made.[32] As part of this chronology, the trial court found that Father "did not appear in court on [28 March 2023], and did not pay the required purge of $6,200.00, so the court ordered that [Father] be arrested and held in custody until he purged his contempt. [Father] was out of state and the order for arrest voided." The trial court found that

---

[32] These "findings" appear to have been based upon the previous orders and documents in the court file, since no evidentiary hearing was held on 25 April 2023.

Father paid $3,300.00 toward the $4,600.00 he had been ordered to pay on 25 April 2023. "Based on [Father]'s non-payment of the $2,600.00 due on [28 March 2023] and his non-payment of the $1,300.00 of the payment due on [25 April 2023], [Father] has failed to purge his contempt and must pay $7,500.00 in order to do so."

Notably, the Amended Commitment Order simply addressed the amounts Father had been ordered to pay in the Contempt Order and did not address Father's present ability to purge himself of the contempt conditions established within the Contempt Order. The trial court was required to consider Father's *present* ability to pay before ordering his commitment for failure to pay the $4,600.00 as directed in December 2022.[33]

As this Court explained in *Collins v. Holley*,

> for each alleged violation, a trial court must consider whether the contemnor indeed can comply with the order. Here, although [the p]laintiff testified to her income and some of her regular expenses, there is simply no way the trial court can project out and assume her income, expenses, or assets in the future; and our law requires a fact-specific inquiry for each alleged violation. Therefore, the trial court erred in ordering [the p]laintiff be automatically incarcerated if she fails to make any

---

[33] We also note that before holding a hearing at which a contemnor may be incarcerated for failure to pay child support, the trial court must determine if he is indigent and whether he may qualify for court appointed counsel. *See McBride*, 334 N.C. at 132, 431 S.E.2d at 19 ("At the outset of a civil contempt proceeding for nonsupport, the trial court should assess the likelihood that the defendant may be incarcerated. If the court determines that the defendant may be incarcerated as a result of the proceeding, the trial court should, in the interest of judicial economy, inquire into the defendant's desire to be represented by counsel and into his ability to pay for legal representation. If such a defendant wishes representation but is unable due to his indigence to pay for such representation, the trial court must appoint counsel to represent him.").

scheduled payment.

___ N.C. App. at ___, 919 S.E.2d at 36 (footnote omitted).

The trial court may designate certain dates for future actions of the parties but cannot automatically order commitment for civil contempt based on a party's failure to comply without also holding a hearing and considering the party's *present ability* to comply at the time of the commitment for civil contempt. The Contempt Order essentially established an ongoing and repeating requirement for Father to appear for calendar calls each month from January to July 2023 to show evidence of his payments made to Mother and for an arrest order to be issued if he failed to do so. But the Contempt Order was not a show cause order, since a show cause order cannot be issued before the date on which a party is to comply with the order.

There was never a show cause order issued in this case, nor was Father provided any notice of his opportunity to "show[] cause why he should not be held in contempt" during the calendar call hearing he was required to attend under the Contempt Order. N.C. Gen. Stat. § 5A-23(a). Since the Contempt Order is not on appeal, we cannot disturb it. But if the trial court enforces it as written, as it did in the Amended Commitment Order, without considering Father's present ability to pay any purge payment ordered at the time of commitment, that commitment order will be in error.

We understand the trial court's and Mother's frustration with Father's continuing failure to pay child support as ordered. Father had a long pattern of

failure to pay child support beyond that reflected in this opinion. According to the Contempt Order, Mother had filed four motions for contempt before the one discussed in that order. But no matter how abysmal Father's record of paying his child support has been, each order for commitment for civil contempt must comply with Section 5A-23 and must take into account Father's present ability to pay when the commitment and purge payment is ordered.

Because the trial court did not consider Father's ability to pay as of 25 April 2023 and did not make findings as to Father's present ability to comply with the Contempt Order, we reverse the Amended Commitment Order.

## IV.    Conclusion

Because Father was entitled to a mandatory stay of the trial court's child custody proceedings under the SCRA due to his required military service on 29 March 2023, the trial court erred in denying Father's Motion to Continue on the Motion to Modify Custody. We reverse the Continuance Order. Because the Motion to Continue should have been allowed under the SCRA and Father was prejudiced by this error, the trial court erred by entering both the Memorandum of Order and subsequent Formal Modification Order. We vacate both the Memorandum of Order and the Formal Modification Order. We reverse the trial court's Amended Commitment Order because the trial court did not receive evidence or make findings about Father's present ability to pay the amount as set by the Contempt Order before ordering his commitment. We remand for a new hearing on Mother's Motion to Modify Custody

and for further proceedings under the Contempt Order.

At any future commitment hearing based on the Contempt Order, the trial court should also consider Father's potential right to appointed counsel if he is subject to incarceration and should make appropriate findings regarding Father's present ability to pay any amounts ordered to purge his civil contempt.

REVERSED IN PART; VACATED AND REMANDED IN PART.

Judges ZACHARY and HAMPSON concur.